

James Mack
ICN: 99000069
Onondaga County Justice Center
555 South State Street
Syracuse, New York 13202

October 3, 2022

Honorable David N. Hurd
Alexander Pirnie Federal Building
10 Broad Street
Utica, New York 13501

**Re:**   US vs. James Mack, Ind. No. 5:20-cr-182-DNH

Dear Honorable Hurd:

This letter is in regards to the above captioned matter. It must be duly noted that I am requesting that this court relieve my attorney of all his duties being that since he has been assigned in June 2022, I have not seen my counsel until September 8, 2022, which was a date before my motion deadlines.

The conflict of interest that resides here, is counsel blatantly ignored incoming calls from me and my family. He hindered me from giving any input on the issues that I believed had merit. He never gave me any opportunities to read any draft. These misconducts by my counsel cannot be waived off as being moot, being that these actions displayed by the attorney tear at the fabric of the constitution, and the reason why the founders constructed such rules of law: "*the sixth amendment guarantees a criminal defendant's right to effective assistance of counsel…..*"

The defendant is not trying to be combative with this court, nor is the defendant attempting to delay proceedings by saying that he does not want his current attorney on his case, and is humbly requesting that this court utilizes its inherent power to relieve counsel of all his duties. On the other hand, the defendant is not capable of representing himself, and should not be forced to continue on with an attorney that is already displaying actions of an ineffective attorney.

The defendant is also requesting that any and ALL his discovery be turned over to him as soon as possible. Specifically, the pictures which illustrate the vehicle, after the defendant was arrested. Now the glaring issue here is the fact that law enforcement testified in state court proceedings that such pictures were lost. Now the question here in federal court becomes "why were the pictures missing in state court, but available in federal court? And who turned such photos over to the AUSA?

With that being said this honorable court should review and accept all my grievances that I have addressed upon this court. It must also be highlighted that a motion will follow this letter of issues that I've informed my counsel that I wanted to be addressed, but his motion was already completed prematurely.

Thank you for your time in this serious matter at hand and I humbly await a prompt response.

Very truly yours,

*James Mack*

James Mack



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK (UTICA)

---

UNITED STATES OF AMERICA,                    Case No. 5:20-CR-00182-DNH

    -vs-

**NOTICE OF MOTION**

    JAMES MACK,
        Defendant.

---

**APPLICATION BY: James Mack**, (Pro-se)

**APPLICATION RETURNABLE DATE: October 11, 2022 at 9:30 a.m.**;
Honorable David N. Hurd
Alexander Pirnie Federal Building,
10 Broad Street
Utica, New York 13501

**SUPPORTING PAPERS:** Supplemental Affirmation.

**RELIEF REQUESTED:** An order requesting that the charges pending against the defendant be dismissed and that this court *grants* a <u>Franks</u> Hearing in accordance with the applicable case law and statue(s), and for any further relief as this court may deem to be just and proper.

**PLEASE TAKE FURTHER NOTICE:** Answering affidavits, if any, are to be served no later than the returnable date of this motion.

**Dated: October 3, 2022**



U.S. DISTRICT COURT - N.D. OF N.Y.
FILED

OCT 1 3 2022

AT_____ O'CLOCK
John M. Domurad, Clerk – Utica

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK (UTICA)

_____

UNITED STATES OF AMERICA,

-vs-

JAMES MACK,
Defendant.

Case No. 5:20-CR-00182-DNH

**MOTION TO DISMISS;**
**MOTION FOR *FRANKS* HEARING;**

_____

I, James Mack, duly swear under penalty of perjury that everything mentioned herein is true and exact to the best of my knowledge, and that I am a pro se litigant and should be looked upon as such.

1.     The above-mentioned defendant moves this court requesting relief dismissing the defendant's charges and granting the defense a *Franks* hearing to determine if the police officers involved in this case lied to obtain a search warrant based on the allegations set forth in this motion, and whatever else this court may deem just and proper.

2.     This Affirmation in Support of the defendant's NOTICE OF MOTION, and the defendant's gained knowledge of certain details regarding this incident from court files, the arresting officer's initial police report, and conversations with his attorney and his family.

1

## PRELIMINARY OF FACTS

3.      On or about October 2019 and February 2020; it was alleged that controlled purchases happened around this time dealing with the defendant and the informant.

4.      Subsequently, Detective Robert Ripley of the Syracuse Police Department, filed for a search warrant application, and such a request was granted.

5.      On or about February 12, 2020, a search warrant was executed on the defendant's place of residence, and the two vehicles that were registered in the defendant's name.

6.      It was alleged that during the search of the 2004 Honda Accord; law enforcement claimed that they noticed a grey sock, which was in a hidden compartment. Law enforcement also noted that they found a quantity of controlled substances and a handgun. It must be further noted that, on one hand, Detective David Proud stated that he found the handgun in a grey sock, while on the other hand, Detective Ripley alleged that he found the gun in a gray glove in this alleged hidden compartment.

7.      The defendant was subsequently arrested and detained on related charges. The defendant is still lodged at the Onondaga Justice Center without bail.

8.      With one previous application being had in this matter, the defendant moves this court requesting that his charges be dismissed and that he be granted a *Franks* hearing, be granted based on the foregoing facts mentioned herein

**The Defendant, James Mack Is Requesting a _Franks_ Hearing in Pursuant to His Constitutional Rights to Illustrate That Law Enforcement Obtained a Warrant Application Unlawfully** (In Violation of The 4th Constitutional Amendment Right.)

9.    The constitutional provision at stake here is the CONSTITUTION OF THE UNITED STATES- AMENDMENT 4:

"*Unreasonable search and seizures. The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or Affirmation, and particularly describing the place to be searched, and the persons or things to be seized.*"

10.    In _Franks v. Delaware, 438 U.S. 154 (1978);_ this United States Supreme Court case is dealing with the defendant's right to challenge evidence collected due to a warrant granted on the basis of a false statement.

11.    In the present case, a search warrant was issued on the 11th day of February, 2020. In such a search warrant application, Detective Ripley states under penalty of perjury that: "*In support of your deponent's assertion as to the existence of reasonable cause, the following facts are based upon personal knowledge of others. Person(s) described as having personal knowledge are referred to as confidential and reliable informant(s) (C.R.I.) (s). The reliability and truthfulness of the confidential and reliable informant with further reference being made to him/her as being the C.R.I. has been verified through prior police investigations which resulted in numerous controlled buys.........The C.R.I. has been providing investigative information to members of the Syracuse Department's Special Investigation Division, Narcotics Unit for several months. The C.R.I. has also provided information during this time on several different investigations, which has been verified as true and accurate through various independent sources.*" *(see Exhibit A, Officer Ripley's Warrant Application- Page 5)*

3

12.     The defendant contends that during the _Darden_ hearing, the C.R.I. testified under oath that this was his first time ever doing controlled buys with law enforcement (**_see Exhibit B, Darden Hearing Report- Page 2_**), and if that is the case, law enforcement misled and blatantly lied to the court to get a search warrant to unlawfully search the defendant's place of residence and his two vehicles.

13.     Under law a _Franks_ hearing is a court proceeding wherein the Court is asked to determine if the police officer involved lied in obtaining a search warrant.

14.     Here in the present case, the defendant argues that the information above highlights how law enforcement involved in his case lied in obtaining a search warrant.

15.     The defendant further argues, that hypothetically speaking, if the C.R.I. lied during the _Darden_ hearing that such controlled buys were his first time dealing law enforcement and it wasn't, then the C.R.I. in this case is clearly unreliable, and nothing that was said to initiate such investigation shouldn't   be considered, nor should anything he mentioned during the _Darden_ hearing be considered reliable information to detain the defendant. And such unreliable sworn testimony must be suppressed by this court's earliest convenience. The defense further contends that excluding the C.R.I., a warrant application pertaining to this incident would have never been had.

16.     On the other hand, the defendant argues that, if law enforcement misled the court by lying to obtain a search warrant in their application, a _Franks_ hearing is necessary to bring such false statements to light.

17.     Either or, a _Franks_ hearing is necessary to determine the validity of the defendant's claim, and should not be overlooked, being that the defendant's constitutional rights are at stake here.

18.     Lastly, a glaring issue that has surfaced with the discovery, are the photographs of the

Honda Accord. State Attorney Klein, and the ADA did not have such photographs. It was said in sworn testimony by the arresting officer that such important discovery was lost (*see Exhibit C, Officer David Proud's Testimony at the April 23, 2021 Hearing- Pages 14-30 of Hearing Transcript*). The question at hand is how were such photographs recovered now to provide the AUSA and this court with?

19.     The defense further argues, that such lost photographs points to foul play.  The NYS ADA had the photographs all along and withheld them from the defense which would bring up very serious issues that could of did away with this case a long time ago.


        **Wherefore,** the defendant humbly requests that this court utilizes its inherent power to dismiss the charges pending against the defendant and/or a *Franks* hearing be had in this matter, to determine if the search warrant was obtained based on false statements, or whatever else is deemed just and appropriate by this court.


Respectfully Submitted,

*James Mack*

*Exhibit A -*
*Warrant Application*
*page. 5*

In support of your deponent's assertion as to the existence of reasonable cause, the following facts are based upon personal knowledge of others. Person(s) described as having personal knowledge are referred to as **confidential and reliable informant(s) (C.R.I.)(s)**.

The reliability and truthfulness of the confidential and reliable informant with further reference being made to him/her as being the **C.R.I.** has been verified through prior police investigations which resulted in numerous controlled buys, which enabled your deponent and other members of the Syracuse Police Department's Special Investigation Division, Narcotics Unit, to arrest individuals for various offense and recover illicit substances. The C.R.I. has been providing investigative information to members of the Syracuse Police Department's Special Investigation Division, Narcotics Unit for several months. The CRI has also provided information during this time on several different investigations, which has been verified as true and accurate through various independent sources.

The identity of these person(s) shall remain confidential as not to jeopardize their safety and the dates on which the controlled purchases were completed are not specified. In this way the confidentiality and safety of the confidential and reliable informant(s) utilized is maximized and the ability of the individuals who are operating this illegal enterprise to determine the identity of the C.R.I. and/or when their enterprise was compromised is minimized.

This investigation was initiated during the month of August 2019, when C.R.I. information was received that a black male, known as "Kicko", described as being approximately 5' 7", with a medium build, was actively engaged in the distribution of **cocaine** throughout the City of Syracuse. This male was said to utilize vehicles to transport and distribute **cocaine**. The male is also known to meet customers in various locations throughout the City of Syracuse.

This investigation was continued on or about the Third week of October 2019. I had a meeting with the above confidential and reliable informant with further reference being made to him/her as being the C.R.I. for the purpose of attempting to purchase a quantity of cocaine from the described black male, known as "Kicko". The

5

*Exhibit B -*
*Darden Hearing, Pg. 2*

alleges that the Application did not establish the requisite probable cause for issuance of such a warrant, and therefore, the Court examined the Application in support of the aforesaid search warrant. Upon a complete review of this Application interpreted in a common sense, non-hyper technical manner and according the issuing judge great deference in finding probable cause, the Court is of the opinion that the search warrant was lawfully issued upon a showing of "probable cause" ( see **People v. Tambe**, 71 NY2d 492; see also **People v. Hanion**, 36 NY2d 549; **People v. Bachiller**, 159 AD2d 955; **People v. Bigelow**, 66 NY2d 417; **People v. Migenis**, 167 AD2d 956; **People v. Johnson**, 66 NY2d 398; **People v. Griminger**, 71 NY2d 635).

## DARDEN SUMMARY REPORT:

Regarding the defendant's motion to produce the informant for a hearing relative to the existence and credibility of the informant's information, this Court held a **Darden** hearing in camera on July 30, 2021. As a result of that hearing, this Court finds that an informant does, in fact, exist and that the reliability of the informant as well as the reliability of the information he/she provided to the police is reliable.

Pertaining to the informant specifically, he/she testified that this particular incident in August of 2019 was the first time he/she had provided information to the Syracuse Police Department regarding individuals engaged in the sales of illegal narcotics. However, the informant did testify that he/she had seen drugs,

2

Exhibit C -
Pgs. 14 - 30

*Pages 14-30 of the April 23, 2021 Hearing Transcripts*

*Officer David Proud's Testimony*

PEOPLE V JAMES MACK

1    MR. PETZOLDT:  No, Your Honor.

2    THE COURT:  Okay.  Then we can proceed, please.

3    MR. PETZOLDT:  People call David Proud.

4    THE COURT:  Good morning, sir.

5    THE WITNESS:  Good morning, Your Honor.

6    THE COURT OFFICER:  Step up for a moment and

7    remain standing.  Raise your right hand.  Do you swear

8    or affirm the testimony you are about to give is the

9    truth, the whole truth, so help you God?

10    THE WITNESS:  I do.

11    DAVID PROUD, called as a witness and

12    being duly sworn, testifies as follows:

13    THE COURT OFFICER:  Please take a seat.  Can you

14    state and spell your name for the record?

15    THE WITNESS:  Yes.  David Patrick Proud,

16    P-R-O-U-D.

17    THE COURT:  Go ahead when you're ready.

18    DIRECT EXAMINATION BY MR. PETZOLDT:

19    Q    Mr. Proud, where are you currently employed?

20    A    The Onondaga County District Attorney's Office as

21    an investigator.  And I'm currently assigned to the DEA task

22    force enforcement Group D-54.

23    Q    And prior to becoming an investigator at the

24    District Attorney's Office, where were you employed?

25    A    By the City of Syracuse Police Department.

PEOPLE V JAMES MACK

1    Q    How long were you so employed with the Syracuse
2  Police Department?
3    A    For approximately 31 years.
4    Q    And I want to direct your attention to February 12
5  of 2020.  What capacity were you employed on that day?
6    A    As a detective sergeant within the Syracuse Police
7  Department within the Special Investigations Division,
8  narcotics section.
9    Q    And can you briefly outline the duties that you
10  had in that role on that particular day?
11    A    Yes.  To oversee -- On that particular day, I was
12  a supervisor on a search warrant execution.  The case
13  investigator was Detective Ripley, a detective assigned
14  under me.  He had a case where the target was living in the
15  Knob Hill Apartments.  So we executed a search warrant on a
16  an apartment as well as on a vehicle.
17    Q    And you said Knob Hill Apartments.  Do you know
18  the address of those apartments?
19    A    I believe the main address is 111 Lafayette Road.
20  I believe.
21    Q    And where are those apartments located?
22    A    They're on the -- I guess it would be the south
23  side, the end of the south side of the City of Syracuse off
24  of East Brighton Avenue and Seneca Turnpike area.
25    Q    And were you aware of the subject of the search

PEOPLE V JAMES MACK

1  warrant that particular day?

2      A    I was.

3      Q    And who was that individual?

4      A    James Mack.

5      Q    What was your role in the execution of this search

6  warrant on this particular day, Detective?

7      A    During the initial part of the case, I was doing a

8  little bit of surveillance, I believe, and just snuck in

9  there ready to do a little takedown vehicle when the subject

10 was spotted.  And then subsequent to that when the actual

11 takedown occurred, I went back to the area of the residence,

12 again, conducted surveillance, waited for other detectives

13 and supervisors to arrive and assisted in the search of the

14 vehicles outside of the residence.  It would be what I would

15 describe as a rear parking lot behind the apartments.

16     Q    And this is a common parking lot, correct?

17     A    It is.  The apartment complex is, I won't say that

18 the entire thing is surrounded by parking lots but at least

19 probably half to three quarters of it is very large volume

20 of vehicles parked outside.  There is also some detached

21 garages, row type garages, if you will.  The particular

22 vehicle that I was assisting in the search was located next

23 to one of those garages.

24     Q    What two vehicles were you assisting in a search

25 of that day?

PEOPLE V JAMES MACK

1    A    There was an SUV.  I believe that it was a Honda

2    Pilot.  I believe.  And then there was a small sedan.  I

3    believe that that was also a Honda.

4    Q    And what was your role in -- I want to talk about

5    the Honda Accord.  You were present at the search of that

6    vehicle?

7    A    I was.

8    Q    And what was your role in the search of that

9    vehicle?

10   A    I took initially, prior to the search starting, I

11   took photographs of the vehicle as well as subsequently the

12   other vehicle, the Honda Pilot.  And then I would take

13   photographs of evidence as it was observed.  And I also

14   assisted in the search and subsequently located an

15   after-market which we refer to as a trap or hiding location,

16   if you will, in the dashboard of the vehicle of the sedan.

17   Q    Okay.  And were you responsible for the taking of

18   the photographs?

19   A    I was.

20   Q    And can you describe the process -- Well, first of

21   all, have you ever performed this function in the execution

22   of a search warrant?

23   A    I have hundreds of times.

24   Q    And just generally, how is that process conducted,

25   for the Court?

PEOPLE V JAMES MACK

1      A      So, I would take -- and this could be relative to

2    a vehicle, an apartment or anything that we're executing a

3    search warrant on, I would take what's referred to as entry

4    photographs.  That's referring to taking photographs prior

5    to a search beginning to document the condition of

6    everything.  Then the evidentiary photos as detectives or

7    myself or anyone who locate a piece of evidence, the

8    photographs are going to be taken of the individual pieces

9    of evidence.  And then subsequent to that we would take

10   what's referred to -- or I would take what's referred to as

11   exit photographs.  And again, that's documenting the

12   condition of whatever it was that was searched once we had

13   completed the actual search.

14     Q      Detective, did you at any point enter the

15   residence inside Knob Hill?

16     A      I did, yes.

17     Q      Did you take any of those photographs?

18     A      I don't believe so, no.

19     Q      Okay.  Now, Detective, you become aware that a

20   number of photographs, the photographs of the vehicle are

21   not able to be located?

22     A      That's correct.  I believe that the photographs

23   from the sedan as well as the Honda Pilot, if that's what it

24   was, are missing.

25     Q      And of course as you testified to, you just took

PEOPLE V JAMES MACK

1    those photographs?  You took those photographs that day?

2        A    I did.

3        Q    Okay.  Do you recall having any difficulties with

4    the cameras that day?

5        A    Yes.  We had a -- normally our -- not to speak

6    disparagingly of our equipment, but our cameras aren't a

7    high-end type of camera.  The camera itself is a low grade

8    camera that in this case it takes a card, SD card, or a mini

9    SD card.  We often have issues with battery strength,

10   battery power or the camera is just not working.

11       On this date I went to two, if not three cameras,

12   attempting to take the photographs.  To my recollection, it

13   was a fairly cold day.  Whether that was causing the issues,

14   I don't know.  But the end result was that I ended up using

15   the camera that was being utilized for the apartment search

16   warrant.  We used that when they were done with it and

17   inserted the card that I was using into that camera and then

18   took the photographs of the Honda.

19       Q    Now, when you take these photographs, Detective,

20   and you're taking the photograph, is it on a camera where

21   you can take a picture and then look at what you took a

22   picture of?  Do you have that capability, if you recall, on

23   this particular day?

24       A    I know at least one of them has that ability.  I

25   can't say that all of them were.  We basically, based on our

PEOPLE V JAMES MACK

1   track record with the cameras, we often have a couple of

2   older cameras in our bag just in case we had malfunctions.

3   I can't say for certain that every one of them had the

4   playback capability, if you will, but I believe at least one

5   of them did, my main one.

6       Q    And how many different, I'm going to call them

7   flashcards or storage device cards on the camera, did you

8   just use one that day?

9       A    I couldn't say for certain at this point.  I

10  believe so.  I don't think it was an issue with the card

11  that we were having, it was with the camera itself.  I

12  couldn't say for 100 percent that I didn't attempt other

13  cards utilizing them at this point.

14      Q    If you had attempted multiple cards, you would

15  have turned those over to the photo division of SPD,

16  correct?

17      A    To the crime scene folks, yes.  I would have

18  turned them in if there was -- if I took photographs on

19  them, yes.  If it was -- if I'm attempting to take

20  photographs and it's not working, then that one I'm

21  obviously not going to turn in.

22      Q    And the flash drive that you utilized to take the

23  photos, you turned over to the crime scene folks?

24      A    You're speaking of the card?

25      Q    The card, the flashcard.

PEOPLE V JAMES MACK

1    A    The card itself, I believe so, yes.

2    Q    And to your knowledge, there were no photographs

3  located on that card?

4    A    I don't know if it's an issue of that they have a

5  blank card or I believe that they don't actually have a card

6  that's -- ultimately they don't have a card that's showing

7  the photographs from outside the parking lot that day.

8    Q    Okay.  But you do recall taking those photographs?

9    A    Absolutely, yes.

10   Q    Okay.  Did anybody else, to your knowledge, take

11  photographs of these two vehicles?

12   A    As far as a separate camera, not to my knowledge.

13  I couldn't say at this point if one of the other supervisors

14  were taking the photographs if I'm buried in the trunk of

15  the car and someone finds something, I can't say for certain

16  that Sergeant Metz didn't grab the camera and take a

17  photograph of another piece of evidence.  I couldn't testify

18  to that with certainty.

19   Q    Would he have used the same camera that you were

20  using?

21   A    Yes.

22   Q    But you don't recall that happening in this

23  particular case?

24   A    I don't.

25        MR. PETZOLDT:  Thank you, Your Honor.  I don't

PEOPLE V JAMES MACK

1    believe I have any further questions for this witness.

2        THE COURT:  Let me follow up and then if you have

3    any follow up.

4        Sergeant Proud, you mentioned at one point going

5    and using -- was it a separate camera that was being

6    used with respect to photographs inside the apartment?

7        THE WITNESS:  Yes, Your Honor.  There was

8    basically two sets of photographs, if you will.  There

9    was -- as opposed to -- I can't tell you what floor it

10   was on.  But the apartment was a significant distance

11   away.  Lieutenant Belgraver was taking photographs

12   inside.  I was taking the photographs of the vehicles

13   outside.  So ultimately what occurred, the way that the

14   photographs were actually obtained was with the camera

15   from the inside search warrant.

16       THE COURT:  So did you go and then get that camera

17   that was used inside and then bring it back outside and

18   take more pictures with that camera?

19       THE WITNESS:  I did, Your Honor, yes.

20       THE COURT:  And do those pictures exist?

21       THE WITNESS:  No.  To try and clarify, there

22   should be two cards, if you will.  If you take the

23   cameras out of play, there were two cards, one card

24   that is the -- we have those photographs from the

25   inside apartment or the apartment photographs.  I would

PEOPLE V JAMES MACK

1    then -- I was having issues with the cameras I'm using,

2    I'm taking a card and inserting it into different

3    cameras.  So there would be two different cards but

4    multiple cameras that I'm attempting.  I have one card

5    that I'm attempting to use in multiple cameras to

6    record the photographs.

7              THE COURT:  Okay.  Thank you.  I appreciate that.

8         Maybe I should direct this question to you,

9    Mr. Petzoldt.  Are there any photographs of these two

10   vehicles outside during the execution of the search

11   warrant?

12        MR. PETZOLDT:  There are no photographs that the

13   crime scene part of the Syracuse Police Department has

14   been able to locate.  The photographs of the inside of

15   the apartment do exist and have been turned over to

16   defense counsel.

17        MR. KLEIN:  Actually, I haven't received those,

18   Caleb.

19        MR. PETZOLDT:  Okay.  I have them.  I can have

20   them brought down here.  I believe they were uploaded

21   to DEMs, but we do have those.  We do have photographs

22   from the inside of the apartment.  There is one

23   photograph of a Ford Escape from the outside -- that

24   appears to be the date and time from the outside.  That

25   is not one of the Hondas.  That is the only photo that

PEOPLE V JAMES MACK

1    was taken or recovered in this search.  But I can get a

2    disc of those photographs to Mr. Klein before he leaves

3    the building today.

4        MR. KLEIN:  It doesn't have to be before.

5        THE COURT:  We can discuss that.  Any other

6    questions, Mr. Petzoldt, based on my question?

7        MR. PETZOLDT:  No, Your Honor.

8        THE COURT:  Mr. Klein, go ahead when you're ready.

9        MR. KLEIN:  Thank you.

10   CROSS-EXAMINATION BY MR. KLEIN:

11   Q    Is it Mr. Proud now?

12   A    I answer to anything.  Hey you.

13   Q    I have a hard time doing that with you.

14   When were you first aware that there was a problem with

15   the photographs that you had thought you had taken of the

16   two vehicles?

17   A    I'm going to say it was maybe a year, somewhere in

18   that range.  A significant amount of time after when the

19   case was adopted federally as well.

20   Q    Okay.  So as far as you know -- As far as you knew

21   for that year, you had taken photos like you did hundreds of

22   times before, correct?

23   A    Correct.

24   Q    And as far as you knew, those photos even with

25   issues with the cameras, you know, having to go to a

PEOPLE V JAMES MACK

1   different camera, or using an additional card perhaps,

2   whatever you did, you thought you had been able to

3   successfully take photographs?

4       A    That's correct.

5       Q    And you would have done -- I think you indicate

6   what you do is you turn the SD card into the crime scene

7   unit?

8       A    That's correct.

9       Q    And you've done that hundreds of times before and

10  you did that -- as far as you recall, either one or two

11  cards you did on this occasion?

12      A    Yes.  And I should clarify with you saying it like

13  that that I actually don't turn it to the crime lab

14  personnel, I turn it to our tech people who then turn it

15  over to them.  So I should clarify.  But ultimately it goes

16  to the crime scene unit.

17      Q    Okay.  Do you remember who your tech person would

18  have been in this instance or it's too long ago?

19      A    Which one of them specifically?  I can give you

20  multiple people that it could have been.  Detective

21  Stockwin, Detective Armstrong, they would be the --

22      Q    They're evidence tech people that work with the

23  detectives in SID?

24      A    Not evidence technicians, no.  Just technical.

25      Q    So they kind of specialize in the technical side

PEOPLE V JAMES MACK

1   of it?

2       A    That's just one of their roles.  Not necessarily

3   specializing in it but one of their roles.

4       Q    Okay.  Once you learned that there had been a

5   problem with the photographs that you thought you had taken

6   and turned in, did you yourself check with the crime scene

7   people or the lab to try to find the SD cards or to figure

8   out what may have happened?

9       A    I can't say at this point that I know they were

10  checked with and I may very well have.  I would like to

11  think for my own wellbeing that I did personally check with

12  them as well.  But I know that they were contacted multiple

13  times about them.  I can't say if I actually did.

14      Q    You indicated that Detective Belgrader -- or

15  Lieutenant Belgrader was the one who was taking photographs

16  inside the residence?

17      A    I believe so, yes.

18      Q    Okay.  Have you seen those photographs?  Have you

19  reviewed those at all?

20      A    I've seen them briefly, yes.

21      Q    And where was that?

22      A    At the District Attorney's Office.

23      Q    Okay.  Recently?

24      A    Yes.

25      Q    Okay.  Do you know how those were provided to the

PEOPLE V JAMES MACK

1   District Attorney's Office from the lab?  Was it on a thumb

2   drive or a disc or in what format?

3        A     They weren't given to me so I have no idea.

4        Q     Okay.  Do you know if there was some evidence

5   recovered from inside the residence also, correct, do you

6   know that?

7        A     I can tell you that I saw photographs of items.

8   One thing that sticks out is a box of rubber gloves.  Other

9   than that, I can't say if it was photographed to memorialize

10  it or if the drugs were actually recovered.

11   ✳ Q     If the police reports associated with this

12  investigation indicate that all items of evidence were

13  photographed, would that have been done separately and

14  afterwards, for example, at the police station or in the

15  evidence lab?

16       A     I'm not sure what you're asking.

17       Q     There is a reference in the reports to all items

18  of evidence were photographed.  Did you take part in that?

19  I'm not talking about as they're being recovered from the

20  scene, but after they're collected, apparently all items of

21  evidence were photographed.  Do you have any memory of that

22  or did you play any role in that?

23       A     I'm not trying to be difficult.  Are you asking if

24  there is separate photographs?  There is a microphone that's

25  located and it's photographed and then it's taken with

PEOPLE V JAMES MACK

1   photographs of the bible and microphone and everything

2   together.

3       ✳ Q     You were present when there was a firearm

4   recovered from the Honda Accord, correct?

5       A       I was.

6       Q       And in the course of your role there you may have

7   taken a photograph of it as it was recovered within the

8   vehicle, correct?

9       A       Not may have.  I did.

10      Q       Okay.  Then the items are taken in to -- and there

11  is a custodial officer at the scene who's taking custody of

12  all the items of evidence?

13      A       While we're still at the scene?

14      Q       Right.

15      A       Yes.  A detective is recovering them.

16      ✳ Q     If there is a reference to all of the items of

17  evidence being photographed later, where would that have

18  been done and who would have done that?

19      A       I guess I'm hung up.  I don't understand what

20  you're talking about that there were photos taken later.

21  I'm not sure what that's referring to.  I'm not sure if

22  that's referencing crime scene or Center for Forensic

23  Science is taking photographs?

24      Q       And it's not in your report so if you don't have

25  any knowledge of it, that's fine.  But Detective Ripley --

PEOPLE V JAMES MACK

1       MR. KLEIN:  This is on Page 11 of his report,

2    Caleb.

3    ✱Q    Says all evidence collected was photographed.  And

4  this is after he's referring to the vehicles being towed and

5  he's finished talking about the searches of -- all the

6  searches.  All evidence collected was photographed, the

7  cocaine and the handgun were turned into the forensic lab.

8  All other items were turned into PSB Room 18 Lieutenant

9  Belgrader took exit photos.  So in reference to all evidence

10  collected was photographed, were you present when any

11  items -- That's all I can ask you is what you know and took

12  part in.  Were you present when all items were photographed

13  somewhere?

14       A    No.  I was present for the photographs that I took

15  of the vehicles.

16       Q    At the scene?

17       A    At the scene, yes.

18       Q    In the parking lot?

19       A    Correct.

20       Q    And you did not take part in the photographing of

21  anything from the residence?

22       A    I don't recall taking any photographs of anything

23  from the residence.

24       Q    All right.  Did you do any work on the

25  investigation of James Mack prior to that date,

PEOPLE V JAMES MACK

1    February 12th of 2020?

2        A    At this point I don't have an independent

3    recollection of assisting on surveillance but I would say

4    that there is a better than not chance that I did.

5        Q    Would you have kept any record of your activities?

6        A    No.  It wasn't my case so not that I recall, any

7    notes or records.

8        *-Q    Is it fair to say that during a search of this

9    nature there is always someone whose role it is to

10   photograph the entry, the pre-search condition, the recovery

11   of the items during the search, and the post-search

12   photographs?  There is always someone assigned to that role?

13       A    I won't say always, but there could be some

14   extenuating circumstances, but generally, yes.

15       Q    What's the reason for that?

16       A    The initial is to document the conditions, the way

17   everything appears the best we can prior to our search.  And

18   then the exit photos are to document the conditions once we

19   leave.  That's for evidentiary reasons as well as protection

20   of the people that own the location, as well as the

21   protection for the police against false claims of damage

22   that didn't occur.  And then the obvious biggest issue is

23   for evidentiary reasons of the actual items themselves.

24            MR. KLEIN:  Thank you.  That's all I have.

25            THE COURT:  Any re-direct, Mr. Petzoldt?

James Mack
(ICN: 99000069)
Onondaga Co. Justice Center
555 South State St.
Syracuse, NY 13202

NEOPOST
10/06/2022
US POSTAGE $009.55º

PRIORITY MAIL

ZIP 13204
041L10425830

U.S. DISTRICT COURT
JOHN M. DOMURAD, CLERK

OCT 1 3 2022

RECEIVED

U.S. DISTRICT COURT
JOHN M. DOMURAD, CLERK

OCT 1 3 2022

RECEIVED

TO:

U.S. Clerk of the Court
Honorable David N. Hurd
Alexander Pirnie Federal Building
10 Broad Street
Utica, New York 13501